UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

                    Plaintiff,

                                             Case No. 17-cr-175-pp

        v.

TERRANCE HAMLIN,

                    Defendant.

## ORDER GRANTING MOTION FOR REVIEW OF DETENTION ORDER AND DENYING REQUEST FOR RELEASE (DKT. NO. 377)

**Background**

        On September 27, 2017, the defendant was temporarily detained after being arrested on a criminal complaint. Dkt. No. 13. The bond study prepared at the time indicated that the defendant was fifty-one years old, lived with his wife in Milwaukee and was self-employed doing a number of different tasks, including home repair and maintenance, buying and selling property, selling cars, running a music studio and selling CDs and clothing. Dkt. No. 40 at 1-2. The report reflected that the defendant had been ███████████████████ ████████████████████████████████████████████. Id. at 3. The defendant had a prior record dating back to 1982, including a 1987 felony drug conviction, a 1988 conviction for third-degree sexual assault and party to false imprisonment, a 1996 conviction for fleeing/eluding, a 1999 conviction for drugs and resisting/obstructing and a 2004 conviction for cocaine. The defendant also was on extended supervision at the time of this offense, it

appears. Id. at 4-5. At the October 2, 2017 detention hearing, the defendant did not contest continued detention. Dkt. No. 48. Pretrial services recommended detention, opining that the defendant posed a risk of flight because he committed this offense while under supervision and that his criminal history included a failure to appear and a conviction for fleeing/eluding, and that he posed a danger to the community because of a history of drug trafficking (including arrests and convictions for drug trafficking). Id.

The grand jury returned a thirty-four-count indictment on October 17, 2017. Dkt. No. 98. It charged the defendant and three others with a drug conspiracy spanning over two years and involving heroin, fentanyl and cocaine. Id. at Count One. It also charged the defendant with nine substantive counts of possession of heroin with intent to distribute. Id. at Counts 3-11.

On March 16, 2020, the parties filed an executed plea agreement, in which the defendant agreed to plead guilty to the conspiracy count. Dkt. No. 364. Three pages of the agreement describe the defendant's role in the conspiracy. Id. at 3-5. The agreement indicates that the drug weight for which the defendant is responsible is at least 100 grams of heroin and at least 500 grams of cocaine. Id. at 364. The agreement acknowledges that the defendant may qualify as a career offender. Id. at 9. The government has agreed to recommend a sentence in a range between 130 and 162 months. Id.

**COVID-19 Crisis**

As of March 15, 2020, the day before the parties docketed the plea agreement, the Wisconsin Department of Health Services web site indicated there had been thirty-five confirmed cases of COVID-19 in Wisconsin. https://www.dhs.wisconsin.gov/covid-19/index.htm. In the two weeks since, the number of confirmed cases has risen to 1,550 (as of the writing of this order). Id. There have been confirmed cases in a local Department of Corrections facility. https://www.jsonline.com/story/news/local/wisconsin/2020/03/27/coronavirus-wisconsin-latest-updates-cases-cancellations/2924044001/. Local jails are limiting bookings and releasing defendants on work release. https://www.jsonline.com/story/news/crime/2020/03/24/waukesha-county-judge-release-some-work-release-inmates/2906215001/. There have been confirmed cases in state prisons and in the Bureau of Prisons. Municipalities, counties and states across the country are working to reduce the number of individuals confined in jails and prisons by releasing people with limited time left on their sentences, or low-level offenders or people charged with non-violent offenses. See, *e.g.*, https://www.prisonpolicy.org/virus/virusresponse.html.

Federal courts are being asked to review detention orders in light of the public health crisis, and the known risks to jail and prison populations given the difficulty of social distancing and the increased likelihood that people in jails and prisons will have health issues that render them more vulnerable to the virus and to becoming more ill if they become infected. A quick Westlaw

search reveals that in two days—March 30 and 31, 2020—there were at least fifteen decisions posted from courts across the country involving requests for review of bond, delay of surrender to serve sentences and contested detention hearings, all referencing the COVID-19 crisis. United States v. Kintea McKenzie, No. 18 Cr. 834, 2020 WL 1503669 (S.D.N.Y. March 30, 2020) (ordering temporary release under 18 U.S.C. §3145(c) of sentenced defendant on a charge of assault with a dangerous weapon; defendant had been released on bond under strict conditions such as GPS monitoring before self-surrendering to the MCC, inmates at the MCC had been diagnosed with COVID-19 and the MCC had classified inmate as "high risk" due to his asthma); United States v. Fiumara, No. 15-94, 2020 WL 1540486 (W.D. Penn. March 30, 2020) (denying motion to lift "no bond" order for defendant who was involved in thirty-month drug conspiracy while on supervision, faced a mandatory minimum sentence of ten years, did not articulate any unique susceptibility to COVID-19 and did not convince the court that she did not pose a danger to the community); United States v. Smoot, No. 19-CR-20, 2020 WL 1501810 (S.D. Ohio March 30, 2020) (declining to release pretrial detainee under 18 U.S.C. §§3145(b) and 3142(i) charged with being a felon in possession of a firearm who had extensive criminal history, did not identify an outbreak at his facility and submitted no proof that his alleged respiratory conditions were not being managed at his facility); United States v. Lee, No. 19-cr-20112-03, 2020 WL 1540207 (E.D. Mich. March 30, 2020) (denying release of pretrial detainee charged in a crack conspiracy on the ground that the COVID-19

4

pandemic alone is not a sufficient basis to justify release; court still must consider 18 U.S.C. §3142(g) factors); United States v. Winchester, No. 18CR301-1, 2020WL 1515683 (M.D. North Carolina March 30, 2020) (declining to release detainee charged with possession of a firearm with obliterated serial number and awaiting sentencing on revocation of supervised release who argued that being incarcerated placed him at greater risk for COVID-19 infection); United States v. Oliver, No. JKB-16-0485, 2020 WL 1505899 (D. Maryland March 30, 2020) (denying motion of defendant sentenced in a racketeering conspiracy to serve the remainder of her sentence on home confinement rather than a halfway house on the basis of the COVID-19 pandemic; defendant had not exhausted remedies and Bureau of Prisons could place her in home confinement); United States v. Williams, No. JKB-15-0646, 2020 WL 1506222 (D. Maryland March 30, 2020) (same as Oliver); United States v. Beamon, Nos. 19-570, 20-040, 2020 WL 1540511 (D. Maryland March 30, 2020) (declining to vacate detention order for pretrial detainee who had been denied release twice before and who relied solely on the COVID-19 pandemic as the basis for release); United States v. Lee, No. 19-cr-298, 2020 WL 1541049 (D.D.C. March 30, 2020) (denying motion of pretrial detainee charged with being a felon in possession of firearms on basis that COVID-19 crisis did not alter analysis under §3142); United States v. Davis, No. ELH-20-09, 2020 WL 1529158 (D. Maryland March 30, 2020) (granting pretrial release to pretrial detainee charged with possession of crack and fentanyl where defendant reported having bronchitis, was in a facility in which five inmates

had tested positive for the virus, had no prior criminal convictions and no history of violence and release conditions included location monitoring); United States v. Nkanga Nkanga, No. 18-CR-713, 2020 WL 1529535 (S.D.N.Y. March 31, 2020) (denying release to 67-year-old former doctor with no criminal record who pled guilty to unlawfully prescribing opioids for non-medical purposes, despite defendant's age, asthma and other medical conditions and the fact that the facility in which he was housed was not taking measures to prevent the spread of the virus, because he had been convicted and the law required remand); United States v. Kerr, No. 19-cr-296, 2020 WL 1529180 (N.D. Tex. March 31, 2020) (denying release to fifty-year-old defendant who pled guilty to receipt of child pornography and who argued that the risk that COVID-19 would reach his facility created exceptional circumstances justifying release); United States v. French, No. 12-cr-00160-JAW, 2020 WL 1539926 (D. Maine March 31, 2020) (granting defendants' motions for temporary bail after finding that neither defendant posed a risk of flight or danger to the community and that both were at increased risk for severe illness if infected due to age and medical conditions); United States v. Brent Brown, No. 08-cfr-20115-JAR-TJJ-01, 2020 WL 1536544 (D. Kan. March 31, 2020) (denying temporary release of defendant detained for supervised release revocation despite health issues relating to his lungs and pneumonia, concluding that under four-pronged COVID-19 analysis, factors weighed against temporary release); United States v. Sanders, No. 19-20037-01-DDC, 2020 WL 1528621 (D. Kan. March 31, 2020) (denying release to defendant charged with drug offenses, possession of

firearms by a felon, §924(c) and keeping a drug house because under four-pronged COVID-19 analysis, factors weighed against temporary release).

**The Defendant's Motion and the Government's Response**

Against this backdrop, the defendant moved under 18 U.S.C. §3145(b) for this court to review the magistrate judge's order of detention, and to release him on house arrest with location monitoring. Dkt. No. 377. The motion indicates that the defendant is seeking release because he is in the class of people that the Centers for Disease Control has identified as being at high risk of becoming severely ill if he contracts COVID-19. Id. at 1. The defendant indicates that he is fifty-four years old and is experiencing ██████████. Id. at 8. He indicates that he has ████████████ and that he suffers from ██████ ████████████████████████████████████████; he indicates that he needs frequent visits with jail medical staff. Id. He states that there is "discussion about him ████████████," and that he is on numerous medications. Id. at 9.

The defendant is incarcerated at the Dodge County Detention Facility. Id. He indicates that he is housed in general population, and thus is exposed "to the normal panoply of contagious and infectious diseases, with the exponentially increased risk posed by COVID-19." Id. He asks the court to release him to house arrest on location monitoring, and agrees to go back into custody if conditions improve such that risks to inmates are reduced. Id. at 10. He asserts that the safety of the community "compels" his release, and notes

that he'll be released into a community that is "locked down." Id. He also does not object to additional conditions. Id.

The government opposes the defendant's request. Dkt. No. 383. The government recounts the measures the Dodge County Jail is taking to prevent the spread of the virus, including conducting temperature checks for officers, kitchen, medical and maintenance staff workers before they start their shifts, segregating all new inmates for fourteen days (and monitoring them during that segregation), temperature-checking and screening new inmates, canceling all programs, canceling in-person visits, limiting professional visits to no-contact visits behind glass with no exchange of papers, additional cleaning, posting information about the virus and the ways to prevent the spread and allowing inmates to request to see medical staff at any time. Id. at 4. The government reports that it conferred with the health service administrator at Dodge, and learned that the defendant is on medication for ██████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████—as of late February. Id. at 5-6. The government emphasizes that neither the defendant nor any other detainee at Dodge has been diagnosed with the virus. Id. at 8. It characterizes the defendant's concerns about an outbreak of the virus at the jail as speculative. Id.

The defendant filed a reply, citing the increases in confirmed cases— outside and inside jails and prisons—in the week since he filed his motion.

██████████████████████

Dkt. No. 386. He cites cases from other districts in which judges have stated that waiting for an outbreak to occur before releasing a detainee would not stem or curtail the crisis. Id. at 2-3. He expresses frustration that the government was able to simply call the jail and obtain his medical information, while the defendant must sign a release and then await production of the records. Id. at 3. He has agreed to provide his medical records to the court on receipt.

The defendant also argues in his reply that the court can order temporary release under 18 U.S.C. §3142(i). Id. at 6-7. He argues that other courts have found that the rapid spread of the virus constitutes a "compelling reason" justifying temporary release. Id. at 7.

**Analysis**

The defendant originally asked the court to review the magistrate judge's detention order under 18 U.S.C. §3145(b), which allows a detained defendant seeking revocation or amendment of that order. The district court judge reviews the magistrate judge's decision *de novo.* United States v. Cross, Case No. 20-CR-9, 2020 WL 1139841, at *1 (E.D. Wis. March 9, 2020) (citations omitted). If the court finds that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of other people and the community, the judicial officer must order detention. 18 U.S.C. §3142(e)(1).

Risk of Flight

At the time of his arrest, the pretrial services officer expressed concern that the defendant posed a risk of flight. While the defendant is a life-long

Milwaukee resident, and at the time of his arrest was living with his wife at the home they'd shared for a little over two years, the defendant was self-employed, doing a variety of jobs. Dkt. No. 40. His criminal record included two failure-to-appear charges (one when he was 19, another when he was 22). His record also includes a charge for fleeing/eluding an officer when he was 30, for which he was sentenced to eighteen months, and a charge of resisting/obstructing an officer in relation to a drug charge. Based on these facts, and on the fact that the defendant committed the instant offense while he was on supervision for a previous one, the pretrial services officer considered the defendant a risk of flight.

The court considers additional factors. Supporting the conclusion that the defendant presents a risk of flight is the fact that he faces a five-year mandatory minimum sentence. In negotiating the plea agreement, the parties determined that the defendant is a career offender, which dramatically increases his advisory sentencing guideline range. The government agreed in the plea agreement to recommend a sentence of between 130 and 162 months—from almost eleven years to over thirteen. The bond study shows that the longest sentence the defendant ever has received is a sentence of ten years, and he appears to have been paroled after five. Even if this court eventually sentences the defendant below the advisory guideline range, he likely will receive a longer sentence than he ever has served.

The defendant argues that if the court releases him, it will be into a "locked down" community. Under the Safer-at-Home order issued by the

Department of Health Services on March 24, 2020, if the defendant were released, he would be ordered to stay at home with only a few exceptions. If the defendant were to take seriously the extreme threat this virus poses to him and to the community, he would abide by that order, reducing the risk that he would flee. But the court also must consider the fact that the defendant has engaged in activity that endangers the community before; his criminal history shows that he has done so more than once. The difference here may be that the defendant himself would be at risk if he violated the Safer-at-Home order, but it is not clear how much of a difference that would make to someone facing five to thirteen years in federal prison.

The defendant also argues that he has shown that he has not a risk of flight, due to an unusual event that occurred earlier in the case. The court has noted that the defendant first was detained in September 2017, when he was arrested. At that time, he was on state probation. See Dkt. No. 12 at 1. At the detention hearing, the government informed Magistrate Judge Jones that there was a state probation hold on the defendant; defense counsel asked the court to go ahead and order the defendant detained under the presumption the court has discussed above. Dkt. No. 48. Some eleven months later, the defendant asked the court to schedule a detention hearing. Dkt. No. 185. He reported that his state supervision had been revoked, and that his revocation sentence would complete sometime in December of that same year (2018). Id. at 1. The defendant reported that he had unspecified medical issues which the Dodge County Detention Center was not equipped to address; he asked to be released

from federal custody so that he could finish the state revocation sentence in state custody. Id. at 1-2. At the hearing on that motion, Judge Jones agreed to release the defendant to state custody, but indicated that he would issue a warrant to act as a detainer to make sure that the defendant was returned to federal custody once released by the state. Dkt. No. 186. Somehow, that warrant was never issued. In mid-February 2019, the defendant was released from state custody. He then reported to his lawyer, and turned himself in to federal court; he appeared on February 15, 2019 before Judge Jones voluntarily. Dkt. No. 218. At that time, defense counsel argued that the fact that the defendant had turned himself in, rather than disappearing, showed that he was not a flight risk. Id. Nevertheless, Judge Jones ordered the defendant detained. Id.

The defendant reiterates now that this incident in 2019—where he was released from state custody with no detainer, yet turned himself in on the federal charge—shows that he is not a risk of flight. The court agrees that in weighing the facts that indicate a risk of flight against those that do not, this incident falls into the latter side of the scale. Judge Jones concluded, however, that it did not outweigh the defendant's failure to comply with his state supervision requirements; this court agrees.

The court concludes that the defendant does pose a risk of flight. "Risk" is a relative term, of course; the defendant does not pose an extremely strong risk of flight. But there are facts supporting a conclusion that the defendant presents such a risk.

<u>Danger to the Community</u>

The bigger concern is the danger the defendant presents to the community. The bond study shows eight drug arrests between the ages of twenty and forty-five. It appears that after a 2004 conviction for possession of cocaine, the defendant served his sentence, was released on supervision, had that supervision revoked and was released to a subsequent term of supervision on June 23, 2015. Dkt. No. 40 at 5. The indictment in this case indicates that the federal drug conspiracy began in at least August 2015—only a month or so after the defendant's release on state supervision. Dkt. No. 98 at 1. The first controlled buy from the defendant took place on August 12, 2015. <u>Id.</u> at 5. At the time he was arrested for this offense, there was $60,000 cash in his house (the house he shared with his wife). Dkt. No. 218-1. The defendant has spent over thirty years involved in the drug trade, has gone to prison three times on drug charges, has committed drug offenses while on supervision. He has signed a plea agreement admitted to obtaining cocaine and heroin from Torrence Harris (who is a fugitive) for re-sale to mid-level traffickers and his own customers. Dkt. No. 364. The defendant's phone was one of those surveilled under a wire tap order, and the government intercepted several drug-related conversations between the defendant, Harris and other members of the conspiracy. <u>Id.</u> In addition to the $60,000 law enforcement found in the defendant's house at the time of his arrest, they found two grams of heroin in a vacant house that he owned. <u>Id.</u>

While it does not appear that this case involves allegations of the use of firearms or the use of violence, the bond study shows that in 1988, at age 22, the defendant was convicted of third-degree sexual assault and party to false imprisonment—charges reduced from first-degree sexual assault and robbery. Dkt. No. 40 at 4. It also shows a 2011 arrest for being a felon in possession of a firearm, although the disposition of that arrest is unknown and a review of the Wisconsin Circuit Court Access Program does not reveal a conviction on such charges.

Finally, it appears that the defendant was supporting himself by dealing drugs. While he indicated to the pretrial services officer that he was self-employed doing a range of jobs from repairing properties to running a music studio, his state probation agent told pretrial services that the defendant sold Mary Kay cosmetics, and that he had a license to purchase and sell vehicles. Despite the peripatetic nature of his employment, the defendant had significant assets at the time of his arrest, including a home, two other pieces of real property and several vehicles. He had a significant amount of cash in his house. The court concedes that the defendant likely had legitimate income (and that his wife appears to have had legitimate income), but given the amounts of drugs involved in the current offense, it is logical to conclude that he was supplementing his income extensively by selling drugs like heroin and cocaine.

The defendant poses a danger to the community.

<u>Presumption of Detention</u>

The next step in the process would be for the court to determine whether there is any condition or combination of conditions that would assure the defendant's appearance or the safety of the community. But there is a rebuttable presumption that there are no such conditions for defendants whom the judicial officer has probable cause to believe committed a drug offense carrying a statutory maximum sentence of ten years or more. 18 U.S.C. §3142(e)(3)(A).

The defendant was charged in the original indictment with a conspiracy that carried a maximum penalty of forty years; based on the amount of drugs attributable to the defendant, he is subject to a five-year mandatory minimum sentence. Dkt. No. 364 at ¶6. There is a statutory presumption, then, that there is no condition or combination of conditions that will assure the defendant's appearance or the safety of the community.

<u>Temporary Release</u>

Section 3142(i)(4) states that after a person has been ordered detained, a judicial officer may "permit the temporary release of the person . . . to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason."

Some courts have used a four-pronged test for analyzing whether a defendant's COVID-19 concerns constitute "another compelling reason" to grant a request for temporary release under §3142(i). In <u>United States v. Clark</u>, No. 19-40068-01-HLT, 2020 WL 1446895 (D. Kan. March 25, 2020), Judge

Angel D. Mitchell articulated "at least" four factors: "(1) the original grounds for the defendant's pretrial detention, (2) the specificity of the defendant's stated COVID-19 concerns, (3) the extent to which the proposed release plan is tailored to mitigate or exacerbate other COVID-19 risk to the defendant, and (4) the likelihood that the defendant's proposed release would increase COVID-19 risks to others." Id. at *3. Judge Mitchell considered the totality of these factors "to help guide the court's determination as to whether a 'compelling reason' exists such that temporary release is 'necessary.' § 3142(i)." Other courts have used this four-prong test to guide their analyses. See, *e.g.*, Smoot, 2020 WL 1501810, at 2-3.

The court finds use of these factors helpful. Several courts have noted that the existence of the COVID-19 crisis alone is not sufficient to justify release if traditional factors warrant detention. If the fact that the country—the world—is in the grip of this pandemic were enough, standing alone, to justify release, the analysis would be simple. Jails and prisons are places where social distancing is difficult, if not impossible. Hygiene techniques such as frequent hand-washing of twenty-seconds or more, coughing or sneezing into a tissue then throwing it away, maintaining a distance of six feet or more from others, refraining from gathering in groups of ten or more, sanitizing surfaces frequently and other recommended techniques for preventing the spread of the virus are demanding for those who are not in custody; likely they are more difficult for those who are in custody. Many inmates have health conditions that make them more vulnerable to severe illness if they were to contract the

virus. Depending on the facility, some inmates must pay for medical care, or have limited access to it. Given these realities and others, if the existence and severity of the pandemic alone were enough to justify release of people otherwise subject to detention, the solution to containing the spread of the disease among inmates would be to release every pretrial detainee.

That solution, however, has the potential to create other problems. Releasing someone from jail will distance him or her from the people in the jail. It will not guarantee that he or she is distanced from people outside the jail upon release. If the person has been exposed while in the jail, he or she may carry the virus to people outside. If the person was detained because he or she posed a danger to the community, the existence of the virus and the new social realities it has created may not serve to mitigate the danger. In some cases, it may increase that danger; if inmates are released but can no longer work the jobs they worked in the pre-COVID area and have no sources of income, they may turn to illegal means to make money, or means that put them in violation of the Safer-at-Home order. In a general sense, neither emptying jails and prisons of all pretrial detainees nor keeping all pretrial detainees in custody is a perfect solution. There likely *is* no perfect solution.

The four-pronged test used by some other courts at least allows the court to consider the specifics of each defendant's circumstances at the time of the motion. The court will consider the defendant's circumstances using those factors.

*The Original Grounds for the Defendant's Pretrial Detention*

The court already has discussed in detail the original grounds for the defendant's pretrial detention. The court has found that the defendant presents some risk of failure to appear and a danger to the community.

*The Specificity of the Defendant's COVID-19 Concerns*

The defendant argued in the motion that he is in the category of people that the Centers for Disease Control considers high risk. Dkt. No. 377 at 8. He indicated that he is 54 years old and was experiencing ▮▮▮▮▮▮▮▮ and that he had other health conditions. Id. at 8-9. The information that the government obtained from Dodge indicated that the defendant had no documented ▮▮▮▮ issues, that he had ▮▮▮▮ that was controlled and stable without an ▮▮▮▮ and that he was on medication for ▮▮▮▮▮▮▮. Dkt. No. 383 at 5-6.

The CDC web site indicates that "those at high-risk for severe illness from COVID-19" are people aged 65 and older, people in nursing homes or long-term care facilities, people with underlying medical conditions (particularly if those conditions are not well controlled), such as chronic lung disease, moderate to severe asthma, serious heart conditions, people with compromised immune systems (including people with cancer, smoking, bone marrow or organ transplants, immune deficiencies, poorly controlled HIV or AIDS and prolonged use of corticosteroids or other immune-weakening medications), people with severe obesity, people with diabetes, people with "chronic kidney disease undergoing dialysis" and people with liver disease.

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited April 2, 2020)[1].

Based on the information before the court, the defendant is not someone the CDC determines to be a person at higher risk. The Wisconsin Department of Health Services web site indicates that of the cases confirmed as of April 1, 2020, nineteen percent were in the 50-59 age group—the defendant's age group. https://www.dhs.wisconsin.gov/covid-19/data.htm. It appears that in Wisconsin, of those individuals who have been confirmed to have the virus, more have been in the 50-59 age group than any other age group except people ages 60-69. While it appears that the defendant may be at a higher risk than a thirty-year-old with no underlying health problems, it is not clear that he is at a significantly greater risk for severe illness if infected, compared to someone who is older or someone with severe illness or comprised immunity.

The defendant is in Dodge, which currently has no diagnosed cases. Dodge is taking measures to reduce the risk of virus spread, which the government outlined in its response brief. The defendant has argued, and courts have held, that the fact that a jail or prison has not yet had a confirmed diagnosis does not mean there won't be one. The court agrees. If the government's only argument against release were the argument that there hasn't yet been a diagnosed case at Dodge, that argument would not suffice, for the same reason that the existence and severity of the pandemic, standing

---

[1] The court attempted to access the URL the defendant cited, https://bit.ly.2vgUt1P. It could not find the article the defendant referenced.

alone, is not a sufficient reason to release someone otherwise subject to detention. But considering that fact along with the defendant's physical risk characteristics and the measures that Dodge is taking to protect against infection and to prevent spread, it is a factor that mitigates against release.

*The Extent to Which the Proposed Release Plan is Tailored to Mitigate or Exacerbate Other COVID-19 Risk to the Defendant*

The defendant has proposed that he "be released to house arrest on location monitoring," and that he be "allowed to leave the house for medical and legal purposes only." Dkt. No. 377. Probation contacted the defendant's wife, who indicated that there were no other individuals in the residence but her, and who stated that she would be supportive of any conditions of release. Dkt. No. 384.

Other than the fact that release will get the defendant out of the Dodge County Detention Center, the defendant's release plan does not address how it will mitigate the risk to the defendant. The defendant indicates that his medical issues require him to make frequent visits to the medical unit at the jail. The court assumes that these issues would require him to make similarly frequent visits to doctors if he were living at home. Those visits would expose the defendant to risk (given that in these days, anyone who visits a hospital or doctor's office is exposed to risk, and exposes others). The release plan does not indicate how the defendant will support himself; it appears that the jobs he was doing before he was arrested were the kinds of jobs that would not be considered "essential" under the Safer-at-Home order. The release proposal does not indicate what the defendant's wife does, or with whom she comes into

contact, or how she supports herself. This factor does not weigh in favor of release.

> *The Likelihood that the Defendant's Proposed Release Would Increase COVID-19 Risks to Others*

The court already has noted that the defendant's release could subject him and others to risk if, as has been true while he has been in custody, he must make frequent doctor/clinic visits. The defendant proposes that he be released on home detention with location monitoring. This would require probation to conduct a home visit to determine whether the defendant's home was appropriate (putting probation at risk), to use a location monitoring unit (of which probation has limited supplies) and to set up that unit (putting probation at risk). The fact that a probation officer might be at risk in effectuating a defendant's release on location monitoring may not, standing alone, be a reason not to release a defendant. But in a situation in which the defendant presents both a risk of non-appearance and a danger to the community, and where that defendant is not at significantly higher risk for severe illness if infected, and where the defendant's release plan is short on details, the court must include in the balance of factors whether the risk to the probation officer is warranted.

**Conclusion**

Every person in our community is at risk from this virus. The risk seems to increase by the day. People are scared. People are suffering physically, psychologically, emotionally and economically. The court knows that members of our community who are in custody share the fear and the suffering; it has

heard from incarcerated individuals, and not just through motions for release. It does not take lightly anyone's fears, or concerns, or risks, not does it blame anyone for seeking any way to reduce those risks. Given the analysis above, the court will deny the defendant's motion. That does not mean that the court does not understand the reasons for the defendant's request or his concerns. The court urges the defendant to take all the steps he can to keep himself, and his fellow inmates, safe.

The court **GRANTS** the defendant's request for review of the detention order and **DENIES WITHOUT PREJUDICE** the defendant's motion for release to home detention on location monitoring. Dkt. No. 377.

Dated in Milwaukee, Wisconsin this 2nd day of April, 2020.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**